IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

QUADREN WILSON,

                    Plaintiff,                                    OPINION and ORDER

   v.
                                                                        25-cv-81-jdp
MARK WAGNER and NATHAN PESKIE,

                    Defendants.

---

The issue in this case is whether defendants Mark Wagner and Nathan Peskie—special agents for the Wisconsin Department of Justice—used excessive force in violation of the Fourth Amendment against plaintiff Quadren Wilson by shooting him while arresting him during a traffic stop. Defendants move for summary judgment, contending that potentially deadly force was justified because they reasonably believed that Wilson was shooting at them from inside his car while they were approaching his vehicle on foot. Alternatively, defendants contend that they are entitled to qualified immunity.

There is still some uncertainty regarding exactly what happened. It is undisputed now that Wilson was *not* shooting at defendants, and no gun was found in Wilson's possession. It is also undisputed that defendants heard a loud noise that defendants interpreted as a gun shot and something hit Wagner's ballistic shield with enough force to knock him backward to the ground. The parties do not cite testimony of anyone who says he or she saw what hit Wagner, but the parties agree that the most likely scenario is that another officer hit Wagner's shield with a tool used to break windows. So there is no dispute that defendants made a mistake.

Let's be frank: this shooting should not have happened. Wilson was not armed, and he did not pose an imminent threat to defendants. There was a fundamental breakdown in

communication among the officers when one of them breached Wilson's window without announcing that to the others. That failure of communication resulted in serious injuries to Wilson, and it could have led to his death. When both the suspect's and the officers' lives are on the line, it is reasonable to expect that officers will take basic steps to coordinate their actions to avoid disastrous consequences. That did not happen here. But the question under the Fourth Amendment is not simply whether the defendants made a mistake. Rather, Wilson must show that defendants' mistake was unreasonable, based on all the information they knew at the time, and considering the split-second nature of the decisions they were faced with.

In this case, the officer who breached the window is not a defendant, so the court need not consider whether his mistake was reasonable. As for Wagner and Peskie, the information they had could support a reasonable belief they were in imminent danger: they had been told that Wilson was usually armed and he had been involved in recent gun shootings, and just before defendants discharged their weapons, something struck Wagner's shield with enough force to create a loud sound and cause him to fall on the ground. Wilson does not cite evidence that defendants either did realize or should have realized that the impact was not caused by a bullet. Wilson also cites no cases in which a court concluded that an officer violated the Fourth Amendment in an even remotely similar situation.

Under these circumstances, the court must grant defendants' motion for summary judgment because defendants mistakenly but reasonably believed that Wilson was shooting at them. The court reaches this conclusion with some reluctance because it is surprising that neither defendant saw what was actually hitting Wagner's shield. But Wilson does not challenge defendants' testimony on that issue. His argument is instead that defendants made a mistake "rooted in tactical negligence" by failing to be more observant. Dkt. 24, at 12.

Tactical negligence is not the standard under the Fourth Amendment. Regardless, Wilson does cite any evidence showing that either defendant actually was negligent. The court must consider whether defendants' use of force was reasonable based on the information they had at the time. Under that standard, and based on the evidence submitted by the parties, defendants are entitled to summary judgment.

## UNDISPUTED FACTS

The following facts are undisputed, except where noted. All facts come from the parties' proposed findings of fact and their testimony. Neither side provided video footage from defendants or any officer on the scene. Defendants provided a dashcam video from a vehicle that was approaching the scene as the relevant events occurred. Dkt. 12-4. But the viewpoint from that footage is too far away to resolve any factual disputes.

Defendants Mark Wagner and Nathan Peskie are special agents for the Wisconsin Department of Justice's Division of Criminal Investigation. On February 3, 2022, defendants were part of a group of agents who were planning to arrest Wilson based on a belief that he was involved in drug trafficking. (Wagner says that Wilson was suspected of being involved in a conspiracy to distribute cocaine. Dkt. 13, ¶ 5. Peskie says he was told that Wilson was involved in trafficking both cocaine and heroin. Dkt. 14, ¶ 8.) Defendants do not explain the basis for that belief, but the issue of probable cause is not part of this case.

Defendants were briefed about Wilson's background and reviewed an operations plan, which included the following allegations about Wilson:

- he had previously been charged with recklessly endangering safety;

- he was "[k]nown to carry a firearm";

3

- he had "a lengthy history of fleeing/eluding;" and

- he had "ties to several shootings in the Madison area."

Dkt. 12-1, at 1–2.[1]

Wilson was subject to GPS monitoring, so officers knew that Wilson was at a local park and ride lot. Defendants drove in an unmarked truck with two other officers—agents Hale and Hawley—to arrest Wilson. A second car driven by another agent was also involved. On the way, the team "was informed" that Wilson had backed into a parking space, so he would be able to see law enforcement vehicles entering.

The officers decided to apprehend Wilson using what is called a "Subject in Custody" maneuver. Defendants describe the maneuver as follows:

> [L]aw enforcement officers . . . maneuver their vehicles so that one law enforcement vehicle is positioned behind the target vehicle and one law enforcement vehicle is in front of the target vehicle. Once a safe position and vehicle is stopped (whether in a parking lot or at a red light), each officer pins the target vehicle between their front and rear containment vehicles, bumping the front and rear bumper of the target vehicle, making it more difficult for the vehicle to flee. When the target vehicle is pinned into place, an arrest team approaches the vehicle on foot in an attempt to gain compliance from the driver and any occupants.

Dkt. 28, ¶ 20.

---

[1] Defendants do not provide the basis for the information in the operations plan, and Wilson disputes the truth of much of that information. But the relevant question for the purpose of this case is not whether the operations plan was accurate, but whether defendants received that information and relied on it. Wilson does not dispute that defendants received the above information, and he does not identify any reason why defendants would have doubted the accuracy of that information at the time. Defendants also say that they were "informed" about other details related to Wilson, *see, e.g.*, Dkt. 28, ¶¶ 8–9, but those details are not in the operations plan, and defendants don't otherwise identify who informed them of those details, so the court has not considered them.

The officers employed the maneuver while Wilson was pulling into an intersection. One law enforcement vehicle "boxed in Wilson's vehicle from the front," and defendants' vehicle "moved into contact with Wilson's rear bumper." Dkt. 28, ¶ 37. The parties dispute whether officers activated their lights and sirens.

The photo below (taken after the incident was over) shows the position of the vehicles:



Wilson's vehicle is the lighter-colored one in the middle.

Once defendants' vehicle made contact with Wilson's vehicle, Wagner and Peskie exited their vehicle, moving toward the driver-side door on Wilson's car. Wagner was in front, holding a ballistic shield. Peskie was just behind Wagner, holding a rifle. Hawley followed with a Halligan tool, which is a specialized, steel-molded tool used by law enforcement professionals for forcible entry. It has a duckbill and a point on one side, while the other side looks similar to a two-pronged fork.

As they approached Wilson's vehicle, defendants saw Wilson's tires spinning and heard his engine revving. Peskie saw Wilson moving the gear shifter from forward to reverse. Wilson admits that he was "hitting the gas," but he says that he was unable to move his vehicle. Dkt. 17-1, at 12.

5

The key events occurred over the span of a few seconds. Defendants repeatedly identified themselves as police and ordered Wilson to show his hands. The parties dispute how Wilson responded to this order. Wilson says that he raised his hands immediately; defendants say they did not see Wilson put his hands up and could not see Wilson's hands. Defendants' view into Wilson's window was impaired by two things: the windows were tinted and there was a glare from the sun. But Wagner could see well enough inside the vehicle to determine that the driver matched Wilson's physical description; Peskie also believed that the driver was Wilson. Wagner stated, "I don't have hands." Hawley interpreted this statement to mean that a window breach "might be necessary." Dkt. 28, ¶ 58.

Wilson and Wagner locked eyes. Wagner "saw Wilson's forearms come together and shoulders square towards him." Dkt. 28, ¶ 64. Peskie saw Wilson turn toward the driver's side window and raise his right fist. The parties dispute whether Wilson has holding something in his hands. Peskie says that he saw Wilson's fist come up while holding a black object that Peskie believed was the muzzle of a firearm. Wilson says that he was not holding anything.

Wagner felt something strike his shield "with unusual force," and he heard a loud sound, which Wagner says he believed was a gunshot. Wagner was knocked backward to the ground. (This is the one part of the relevant events that is shown in the video. The video shows Wagner falling to the ground from a distance, but the video is so far away it does not clearly show what caused Wagner to fall.) Wagner fired his handgun "toward the suspect vehicle." Dkt. 28, ¶ 68. Wilson says that he heard someone yell, "gun," so he dove toward the passenger side of the vehicle, and then he heard gunshots.

The parties do not say where Peskie was standing. But as Wagner was going down, Peskie "saw what appeared to be a hole form in the front driver's-side window [and] saw glass

6

come outward toward the officers." Dkt. 28, ¶ 70. Peskie fired his rifle toward Wilson's "lower back area." Dkt. 28, ¶ 71. Peskie stopped firing when he saw Wilson flinch and fall across the console.

The parties do not say how many times Wilson was shot or whether it could be determined which officer or officers shot him. But at least one bullet hit Wilson in the back.

Other officers approached Wilson, extracted him from the car, and placed him under arrest. He was then taken to a hospital.

Neither side cites the testimony of a witness who observed what actually struck Wagner. But the parties agree that the impact "likely came from the Halligan breach sequence rather than from an actual bullet strike." Dkt. 28, ¶ 81. Neither side explains in their proposed findings of fact why another officer would have hit Wagner's shield with the Halligan tool or how that could have happened.[2] It is undisputed that Wilson was unarmed.

---

[2] Hawley, the officer holding the Halligan tool, was not deposed, and he did not submit a declaration. But defendants' law enforcement expert stated the following after watching the video:

> I then see the Halligan tool officer twist his hips in order to wield the Halligan, wind up, and then strike the suspect's vehicle on driver's side, pull it out and rewind up, and then struck the driver's side window. It is very possible that the pry end of the Halligan tool struck the shield held by Wagner. This positional readjustment and second hip action further contacts Agent Wagner and off-balancers Wagner and any accompanying noise/sound as the Halligan tool impacts the shield could easily be mistaken for the sound and impact of a gunshot.

Dkt. 17-3, at 20. Neither side relies on the expert's testimony, so the court need not consider whether it is admissible.

ANALYSIS

Wilson asserts one claim against each defendant: they used excessive force in violation of the Fourth Amendment when they shot at him. The basic question for an excessive force claim under the Fourth Amendment is whether the officer used "greater force than was reasonably necessary." *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016).

In assessing reasonableness, the court must consider all the relevant circumstances. *See Barnes v. Felix*, 605 U.S. 73, 76 (2025). Relevant factors include the seriousness and immediacy of any threat posed by the plaintiff, the severity of any suspected crime, and the extent of the plaintiff's resistance or interference with an officer's duties. *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015). Deadly force such as shooting a gun at the suspect violates the Fourth Amendment unless the suspect puts the officer or someone else in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force. *Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015). This determination is made from the perspective of a reasonable officer in light of the totality of the circumstances known to the officer, without regard to the officer's intent or his subjective beliefs. *Williams v. Indiana State Police Dept.*, 797 F.3d 468, 472–73 (7th Cir. 2015); *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 724 (7th Cir. 2013).

The standard changes when the defendants are asserting a qualified immunity defense, as defendants in this case are. Specifically, the plaintiff must either point to a closely analogous case that established a right to be free from the type of force the police officers used on him, or show that the force was so plainly excessive that more general case law put the defendants on notice that they were violating the Fourth Amendment. *Chelios v. Heavener*, 520 F.3d 678, 691–92 (7th Cir. 2008).

On a motion for summary judgment, the question is whether there are any genuine disputes of material fact. Fed. R. Civ. P. 56(a). A factual dispute is genuine if it is based on admissible evidence that actually contradicts opposing evidence. *See Carroll v. Lynch*, 698 F.3d 561, 565 (7th Cir. 2012). A genuine factual dispute is material if it could make a difference to the outcome of the case, or, in other words, a reasonable jury could find for the nonmoving party, after drawing all reasonable inferences in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314–15 (7th Cir. 2011); *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). In deciding whether a defendant is entitled to qualified immunity on a motion for summary judgment, the court must decide whether the defendants violated the plaintiff's clearly established rights when the evidence is viewed in the light most favorable to the plaintiff. *Jerger v. Blaize*, 41 F.4th 910, 913 (7th Cir. 2022); *Kemp v. Liebel,* 877 F.3d 346, 350 (7th Cir. 2017).

If the court viewed the events from *Wilson*'s perspective, then it would be clearly established that defendants violated Wilson's Fourth Amendment rights. Wilson was unarmed, and he says he immediately put his hands up when directed to by defendants. As Wilson points out, officers may not use deadly force when a suspect is compliant, and the officers know he is unarmed. *See Williams*, 797 F.3d at 484–85. It is true that Wilson admits that he was "hitting the gas" after his car was boxed in, and the danger posed by a fleeing suspect's car can sometimes justify deadly force. *See Plumhoff v. Rickard*, 572 U.S. 765, 777–78 (2014). But Wilson says his car was not moving at all, and defendants do not say that it appeared that Wilson could break free, so his car did not pose an imminent threat.

The problem for Wilson is that the Fourth Amendment standard requires the court to view events from the perspective of a reasonable officer in the *defendant's* situation, *Pam v. City*

*of Evansville*, 154 F.4th 523, 532 (7th Cir. 2025), and there is no Fourth Amendment violation if the officer made a reasonable mistake of fact, *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015). The court must still draw all reasonable inferences in the plaintiff's favor, which means that the court must disregard defendants' allegations that Wilson refused to comply with defendants' commands to put his hands up and that they could see him holding something in his hand. But this still leaves the following undisputed facts:

- Defendants were told that Wilson had previously been charged with recklessly endangering safety, he was known to carry a firearm, he had a history of fleeing police, and he had ties to several shootings.

- Defendants' view into Wilson's car was obscured by glare from the sun and by his tinted windows.

- Defendants saw Wilson moving his arms in their direction.

- Wagner felt something strike his shield "with unusual force," and he heard a loud sound.

- Wagner was knocked backward to the ground from the force of the strike.

- Peskie saw Wagner being knocked and "saw what appeared to be a hole form in the front driver's-side window [and] saw glass come outward toward the officers." Dkt. 28, ¶ 70.

To sum up, defendants were informed that Wilson was often armed and he had been involved in gun shootings, and Wagner's shield was struck by something that caused a loud sound and knocked him backward on the ground.

Wilson does not cite any evidence disputing the truth of the above facts. For example, Wilson does not adduce evidence or even allege that one or both defendants knew that any of

the information they had received about Wilson was false, that defendants could see that Wilson had not fired a gun, or that defendants knew that Wagner had been struck with the Halligan tool rather than a bullet. Instead, Wilson says that the jury could find that it was unreasonable for defendants believe that he was shooting at them. But that argument misunderstands the relevant standard. When the material facts are undisputed, the reasonableness of an officer's force is a question of law for the court, not a question of fact for the jury. *Phillips v. Community Ins. Corp.*, 678 F.3d 513, 520 (7th Cir. 2012).

Wilson has not shown that defendants unreasonably believed they were in imminent danger. He identifies no reason why defendants should have known that the strike Wagner experienced was not a gunshot. The court must accept Wilson's testimony that he was not holding a weapon, but that does mean he did not have easy access to one. Wilson does not allege that either defendant saw an officer using the Halligan tool, that any officer gave defendants a warning that a Halligan tool would be deployed imminently, that a bullet would have penetrated Wagner's shield or would have felt obviously different upon impact, or that the noise Wagner heard was obviously not a gunshot. In hindsight, it may seem that defendants should have figured out what was really going on. But this is a prime example of a situation in which the officers were faced with "the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances." *Jackson v. City of Madison*, 176 F.4th 1005, 1023 (7th Cir. 2026) (internal quotation marks omitted). The undisputed facts show that defendants had been informed that Wilson had a violent past and was possibly armed and that Wagner's shield was suddenly struck with unknown force that was strong enough to knock him down. Based on the evidence cited by the parties, Wilson has not shown that it was

11

unreasonable for defendants to believe that Wilson posed an imminent threat of serious bodily harm.

Wilson says that *Estate of Starks v. Enyart*, 5 F.3d 230 (7th Cir. 1993), clearly establishes that defendants' conduct violated the Fourth Amendment, but that case bears little resemblance to this one. The officer in *Starks* shot a suspect in his car while the suspect was driving toward him. There was a factual dispute regarding whether the officer jumped in front of the suspect's car before or after the suspect started driving. If the officer jumped in front of the suspect before the suspect began driving, then there was no Fourth Amendment violation; but if the officer jumped in front of the car at last second, then it was the officer who placed himself in danger, so deadly force would not be justified. *Id.* at 234. So the case could not be resolved on a motion for summary judgment.

This case does not involve the sort of factual dispute at issue in *Starks*. Wagner and Peskie did not create the perceived emergency; they were responding to external forces. It may be that Hawley or another officer was negligent by using the Halligan tool improperly or by failing to communicate to defendants that he was about to deploy the Halligan tool so defendants could get out of the way. But Wagner and Peskie are the only two defendants in

12

this case, so the court need not consider whether anyone else violated the Fourth Amendment or otherwise acted unreasonably.[3]

In his proposed findings of fact, Wilson seems to suggest that the court should view defendants' conduct through a wider temporal frame. Specifically, he says that "[t]he agents utilized a 'Subject in Custody' (S.I.C.) maneuver, which Agent Wagner himself described as a 'dangerous technique' typically used only as a last resort." Dkt. 24, ¶ 18. Wilson does not develop this issue in his brief, so the issue is arguably forfeited, but Wilson seems to be saying that defendants should not have used the maneuver in the first place, and their decision to use the maneuver created the chain of events that led to his injuries.

Defendants explained in their proposed findings of fact why they took Wilson into custody in the manner that they did, including that his home was difficult to surveil and

---

[3] Wilson cites two other Seventh Circuit cases about excessive force, but they are similarly unhelpful. *See Catlin v. City of Wheaton*, 574 F.3d 361, 363 (7th Cir. 2009) (affirming summary judgment in favor of officers who tackled someone they mistakenly believed was a suspect); *Sledd v. Lindsay*, 102 F.3d 282, 287–88 (7th Cir. 1996) (factual disputes precluded summary judgment when officers shot plaintiff after failing to identify themselves as officers). Wilson also cites a district court case and cases from other circuits. Those cases can't clearly establish the law in this circuit unless they establish a clear trend. *See Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017). Regardless, those cases are not on point either. *Lewis v. Charter Twp. of Flint*, 660 F. App'x 339, 343 (6th Cir. 2016) (qualified immunity not appropriate because facts viewed in plaintiff's favor showed that plaintiff "was merely trying to flee a traffic stop in a vehicle, which alone is not sufficient to justify the use of deadly force"); *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 700–01 (10th Cir. 1995) (qualified immunity was not appropriate because there was a fact dispute regarding whether suspect lunged at officers with a knife before they shot him); *Est. of Fields v. Nawotka*, No. 03-CV-1450, 2008 WL 746704, at *3 (E.D. Wis. Mar. 18, 2008) (denying summary judgment when officer shot at car driving away at approximately 10–15 miles per hour). Wilson also cites *Alexander v. City & Cnty. of San Francisco*, 29 F.3d 1355 (9th Cir. 1994), but the Ninth Circuit has since recognized that *Alexander* has been abrogated. *Woodward v. City of Tucson*, 870 F.3d 1154, 1158 (9th Cir. 2017). Regardless, that case is about officers who forcibly entered the home of a "mentally ill, elderly, half-blind" man and used deadly force on him, *Alexander*, 29 F.3d at 1367, so it is not instructive.

children were present there, and that his parole agent did not want Wilson arrested at the parole office because Wilson was often armed. Dkt. 28, ¶¶ 12–14. Wilson does not meaningfully respond to these concerns.

Regardless, "the court of appeals has rejected the view that a use of force is unreasonable simply because an officer's earlier mistakes helped create a situation that required a use of force." *Stabenow v. City of Eau Claire*, 546 F. Supp. 3d 787, 797 (W.D. Wis. 2021). An officer's earlier conduct can make a use of force unreasonable if "the officers acted so far outside the bounds of reasonable behavior" that the use of force "was almost entirely a result of the officers' actions." *Est. of Biegert by Biegert v. Molitor*, 968 F.3d 693, 698 (7th Cir. 2020). That rule is not inconsistent with the Supreme Court's decision in *Barnes* that "the 'totality of the circumstances' inquiry into a use of force has no time limit" because the Supreme Court declined to consider "whether or how an officer's own creation of a dangerous situation factors into the reasonableness analysis." 605 U.S. at 83–84. So *Biegert* is controlling. *See Pam,* 154 F.4th at 534 *(*reaffirming *Biegert* after *Barnes*). But Wilson does not even attempt to show that defendants' conduct meets the *Biegert* standard.

Wilson raises one other point, which is that "Agent Peskie admitted to firing a rifle volley into Wilson while the latter was already 'flinching and falling across the console.'" Dkt. 24, at 15. That is incorrect. In the cited testimony, Peskie says that he saw "Wilson flinch and fall across the console onto the passenger seat" *after* Peskie "fired a quick volley that was probably three to five shots within about one second," and Peskie stopped firing immediately after that. Dkt. 14, ¶ 35. Wilson cites no evidence that either defendant shot at him after they could see that he was not firing on them.

The bottom line is that, even drawing all reasonable inferences in Wilson's favor, the undisputed facts show that defendants mistakenly but reasonably believed that they were in imminent danger of serious bodily harm when they fired their guns at Wilson, so defendants did not violate the Fourth Amendment. And even if a reasonable jury could find that defendants used excessive force, Wilson has not shown that any constitutional violation was clearly established. So the court will grant defendants' motion for summary judgment.

ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Mark Wagner and Nathan Peskie, Dkt. 11, is GRANTED. The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered July 9, 2026.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

15